Patricia V. Waterkotte (Bar No. 029231)
Zoey Kotzambasis (Bar No. 034607)
**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
(520) 792-4800
pwaterkotte@rllsaz.com
zkotzambasis@rllsaz.com

Kal K. Shah (*pro hac vice*)
Emily Wilbur (*pro hac vice*)
Samantha L. Marchand (*pro hac vice*)
**Benesch Friedlander Coplan**
**& Aronoff LLP**
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
(312) 212-4949
kshah@beneschlaw.com
ewilbur@beneschlaw.com
smarchand@beneschlaw.com

*Attorneys for Plaintiff Pyramid Technologies, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Pyramid Technologies, Inc.,<br><br>Plaintiff,<br><br>vs.<br><br>Freedom Gateway, LLC; SGK Vending, LLC, and SGK Tech, LLC,<br><br>Defendants. | NO. 2:26-cv-01535-SHD<br><br>**PLAINTIFF PYRAMID TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS DEFENDANTS' MONOPOLY COUNTERCLAIMS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**<br><br>(Assigned to Hon. Sharad H. Desai) |

Pyramid's Motion to Dismiss is limited to Defendants' claims of monopoly because the parties' dispute, and their market positions, in no way implicates such legal issues. Skills gaming printers and validation solutions are wide-ranging and the market is highly competitive; indeed, Pyramid and Defendants are small fish in a very big pond. Pyramid brought this suit because despite the other options and approaches, Defendants chose to illegally misappropriate Pyramid's unique validation system.

Rather than focus on the actual dispute and corresponding failure to adequately plead monopoly claims, Defendants' Opposition to Pyramid's Motion to Dismiss (the "Opposition") attempts to rewrite history. But the contemporaneous record, as reflected in Pyramid's Complaint, is clear. Defendants breached Pyramid's contract and when confronted, their CEO assured Pyramid that Defendants would comply with their legal obligations. They failed to do so resulting in this lawsuit. Defendants' attempt to blame Pyramid for their misconduct rings hollow and is a red herring.

The Opposition fails to establish a viable claim under applicable monopoly law. Defendants resort to conclusory allegations and hyperbole.[1] But that is insufficient to establish the necessary legal predicates of monopoly power and market harm. Accordingly, Defendants' Counts I (Monopolization) and II (Attempted Monopolization) should be dismissed with prejudice.

## ARGUMENT

### I. Defendants Fail to Adequately Plead Monopoly Power Both Directly and Indirectly

It is now clear that Defendants cannot adequately plead monopoly power as a matter of law—through *either* direct or indirect evidence. *See* Dkt. 39 at 6-7. ***First***, as Pyramid explained, Defendants' allegations of supracompetitive pricing are wholly

---

[1] Defendants bizarrely claim Pyramid "makes no mention of the counterclaim allegations." Dkt. 41 at 1. Even a cursory review of Pyramid's Motion reveals repeated citations to and quotations from the Amended Counterclaims across every substantive section. Dkt. 39 at 6–17. *State Farm Life Insurance Co. v. Landfried* is thus inapposite. 2020 WL 5356706, at *3 (C.D. Cal. June 25, 2020).

deficient thus defeating any purported direct assertion of monopoly power. Pyramid is free to do business with whom it chooses and the Amended Counterclaims are devoid of any assertion that Pyramid's pricing, even if higher for certain customers, exceeds the level that would prevail in a competitive market. *Cf. CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1069 (9th Cir. 2025) (supracompetitive pricing exists where a market participant can price substantially above the competitive level *and* persist in charging substantially high prices for many years). ***Second***, contrary to Defendants' conclusory argument, Pyramid did establish the Amended Counterclaims were insufficient to establish monopoly power indirectly. Defendants conspicuously omit the legal requirements for adequately pleading monopoly power indirectly, namely: (i) significant barriers to entry; (ii) existing competitors lack the capacity to increase output in the short run; and (iii) barriers to expansion. *Gamboa v. Apple Inc.*, 808 F. Supp. 3d 951, 969 (N.D. Cal. 2025). Defendants' counterclaims not only omit these key elements, they dispositively establish the counter.

As to the first requirement, barrier to entry, Defendants' counterclaims fail to establish the hallmark of entry barrier: that any purported barriers to entry were caused by Pyramid or different than those faced by Pyramid. *See Malheur Forest Fairness Coalition v. Iron Triangle, LLC*, 699 F. Supp. 3d 1086, 1109 (D. Or. 2023) (stating that a new market entrant is disadvantaged only to the extent it must pay more than the established market participant). Defendants boast that they easily captured market share from Pyramid with a "superior," "more cost-effective," and "more secure" product. Dkt. 35 ¶¶ 25, 46, 56, 114, 130–31, 194, 201, 218.

Defendants also ignore entirely the market landscape consisting of scores of competitors as identified in Pyramid's Motion. Instead, Defendants baldly claim Pyramid allegedly controls 70% of the pled markets; Pyramid does not. But even if it did, that is not enough. *See Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) (explaining that even a 100% market share does not establish monopoly power if

others can enter the market, or if rivals could increase their output); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors."). Defendants' Amended Counterclaims are entirely devoid of any allegation that competitors, including themselves, were unable to increase output in the short run or that there were barriers to expansion. The mere fact that Pyramid may be favored in some markets, even if as high as 70%, alone cannot establish monopoly power. *See Malheur Forest Fairness Coalition*, 699 F. Supp. at 1109 (dismissing monopolization claims despite allegations of over 95% market share where claims were devoid of barriers to entry and barriers to expansion). For these reasons, Defendants' monopolization claims fail.

## II. Defendants' "Monopoly Broth" Theory Cannot Carry The Day

Defendants attempt to convince this Court to overlook their pleading shortcomings by arguing the focus should be on alleged conduct in the aggregate. Pyramid does not disagree, but as the Ninth Circuit held in *Dreamstime.com, LLC v. Google LLC*: if each individual action alleged "does not rise to anticompetitive conduct in the relevant market, their collective sum likewise does not." 54 F.4th 1130, 1142 (9th Cir. 2022). Even in the aggregate, the facts do not demonstrate anticompetitive conduct.

Even if Defendants' allegations were true (they are not), Pyramid would be entitled to stop selling Defendants Sentry Dongles following Defendants' breach of the OEM License and Sales Agreement (the "Agreement"). The Supreme Court has "been very cautious in recognizing [refusal to deal] exceptions" and Defendants do not justify departing from the general rule that there is no duty to aid competitors. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408-10 (2004). While unclear, Defendants appear to attempt to rely on the *Aspen Skiing* exception, but that exception requires Defendants to demonstrate: (1) Pyramid unilaterally terminated a voluntary and profitable prior course of dealings with a rival; (2) the only conceivable rationale for the

termination must have been to sacrifice short-term benefits to obtain higher profits through the exclusion of competition and, (3) Pyramid already sells the products in the existing market to similarly situated customers. *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 994 (9th Cir. 2020). Defendants do not even acknowledge these requirements in their Opposition let alone identify where they are set forth in the Amended Counterclaims. In reality, Defendants did not and cannot meet this "rare" exception. *Id.*

*MetroNet Servs. Corp. v. Qwest Corp.*, is instructive here. 383 F.3d 1124, 1132 (9th Cir. 2004). In *MetroNet*, the conduct did not fit this narrow exception because despite a change in prior dealing, Qwest found that the dealing with MetroNet was no longer profitable and switched its pricing program to *increase* profits. *Id*. Here, even if Pyramid stopped providing Dongles to Defendants after Defendants' breach of the Agreement, Pyramid's profitability is contingent on licensees following the use restrictions required by the contract. Dkt. 35 ¶ 92 (counterclaims acknowledging that "Freedom Gateway had not purchased enough Sentry Dongles to cover its usage"). Defendants' own admissions regarding Mr. Alexander's denouncing the Agreement (*Id.* ¶¶ 90-91) combined with recognition of Defendants' misuse (*Id.* ¶ 92) shows Pyramid had a valid business justification for refusing to sell additional Dongles to Defendants. By the face of Defendants' own pleading, Defendants cannot put forth a case under this limited exception. *See, e.g., SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 897 (E.D. Pa. 2020) (dismissing monopolization claim where a breach of contract caused the refusal to deal since "[t]he mere existence of a contractual duty to supply goods does not by itself give rise to an antitrust duty to deal").

Nor does Defendants' creative characterization of Pyramid's pricing as a "Connor tax" save the day. Defendants wholly ignore the scores of cases cited by Pyramid establishing the benefit competitors face from higher prices and that loyalty discounts are nonactionable. Defendants here rely only on *CoStar Grp., Inc.*, 150 F.4th at 1074. But in *CoStar*, the complaint alleged that the defendant entered into exclusive contracts with

brokers that had the de facto effect of forbidding brokers from doing any business with the plaintiff. Specifically, the plaintiff alleged that when it "offered to match listings posted on a broker's own website, the broker stated that this would be "problematic in regard to [his] contractual relationship with CoStar." *Id.* at 1074. The complaint also alleged that "CoStar constructed technological barriers that impede CREXi's ability to access brokers' listing information that is otherwise available to the public on brokers' own websites" which inhibited "the free transfer of information from brokers to companies that compete with CoStar." *Id.* at 1075. No such coercive conduct is alleged here: through barriers to access a competitor's product, exclusive contracts, or otherwise.[2] Consumers are entirely free to give their business to Defendants or other competitors in the market.

These limited claims are the only pre-lawsuit allegations Defendants rely on for their "Monopoly broth" theory. None presents a "coordinated, multi-year campaign" against competition, rather they take place over a few months and involve only Plaintiff and Defendants or their customers. The remaining allegations are exclusive to Pyramid's lawsuit and necessarily fail under the *Noerr Pennington* doctrine. *See also Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1063 (9th Cir. 1998) (When "a plaintiff seeks damages ... for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required."). Defendants do not address the probable cause requirement, requiring a litigant to have no more than a reasonable belief that there is some chance a claim may be held valid upon adjudication. To the contrary, Defendants rely exclusively on their disgruntlement for being sued to argue Pyramid's claims are objectively baseless. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993); *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 929

---

[2] The purported monopoly "scheme" is instead more similar to preferred or loyalty rates seen across numerous industries such as hospitality, food and beverage, auto services and e-commerce.

(9th Cir. 2024). Defendants' feelings cannot overcome *Noerr Pennington*. Therefore, Defendants' monopolization claims fail for failure to allege anticompetitive conduct alone.

### III. Defendants Do Not Allege Conduct That Harms The Market

Defendants' inability to establish monopoly power alone warrants dismissal of Counts I and II. Those claims, however, are further unsustainable because a monopoly requires harm to the market *as a whole*, not just an aggrieved single competitor. *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008). Yet, the challenged counterclaims rest overwhelmingly on harm to Defendants: Defendants' decreased sales, Defendants' lost customers, and interference with Defendants' own business. This is legally insufficient.

Defendants allege Pyramid's purported higher prices to establish market harm, but to do so Defendants must allege that Pyramid first drove out competitors through below-cost pricing. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). Charging high prices for a product standing alone is insufficient to demonstrate anticompetitive conduct. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) ("the exclusionary effect of prices ***above*** a relevant measure of cost either reflects the lower cost structure of the alleged predator, ***and so represents competition on the merits***, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting" (emphases added)). Defendants in fact tout their product as superior and lower cost, stemming any claim of monopoly power. Customers are free to purchase from Defendants, a lower-price competitor. This is quintessential competition – not antitrust conduct.

Finally, Defendants' allegation that Pyramid's "exclusionary condition" to pricing suppresses competition is insufficient to establish market harm.[3] Dkt. 41 at 14. Defendants

---

[3] As discussed *supra* Section II, Defendants fail to allege a recognizable pattern of exclusionary conduct sufficient to state a claim for anticompetitive conduct. That failure dooms Defendants' ability to tie any purported antitrust injury to the "exclusionary

admit competition exists and is robust in the market. Dkt. 35 ¶ 167 (recognizing large industry conference); *Id.* ¶ 21 (SGK "innovate[d]" the market). The mere fact that some customers might be "deterred" from purchasing from Pyramid is insufficient to establish coercion. Dkt. 41 at 14. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010) (finding no antitrust injury where plaintiff "never explained why price-sensitive hospitals would adhere to Tyco's market-share arrangements when they could purchase less expensive generic sensors instead" and holding arrangements did not "force[] customers to purchase its sensors rather than generics"). Instead, the deterrence could be based on product quality, familiarity, trade secrets or other intellectual property or a host of other legally permissible bases. As such, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, is directly on point, and Defendants similarly are unable to allege an antitrust injury. 475 U.S. 574 (1986). Defendants' monopolization claims must fail as a result.

**IV. Defendants' Alleged Submarkets Are Facially Unstable**

Defendants rest on two markets to support their monopoly counterclaims—the Relevant Ticket Printer Market and the Relevant Ticket Validation Solution Market. But these cherry-picked categories cannot be the basis of a monopoly claim. Defendants attempt to explain their market definition with a comparison of extremes: "manual validation or basic printers with plain-text receipts." Dkt. 41 at 2. But the market is riddled with options between manual validation, plain-text receipts and Pyramid's proprietary validation solution. *See* Dkt. 39, Ex. 1; *see also Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023) (dismissing antitrust claims for failing to adequately plead cross-elasticity (i.e. reasonable interchangeability of products)).

No doubt recognizing these critical weaknesses, Defendants attempt, for the first time through the Opposition, to limit their allegations to the submarket of "QR-code-based

---

condition." *See Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 334 (1990) (antitrust injury must be "attributable to an anti-competitive aspect of the practice under scrutiny").

ticket printers" and, consequently, QR-code-based ticket validation solutions. *Id.* This too underscores that Defendants cannot identify a legally cognizable market. QR codes are ubiquitous and Defendants identify no unique application to create a protectable market based on QR codes. Defendants must set forth that the submarket is economically distinct from the general product market. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); Dkt. 39 at 15. The Amended Counterclaims do not contain such allegations. Instead, Defendants make bare-bones, conclusory statements that other forms of ticket validation have "fallen out of favor with the skill game industry"—necessarily acknowledging that there are substitutes. Dkt. 35 ¶ 54; Dkt. 41 at 15.

Alleged popularity of a given ticket validation solution is not the standard. Defendants fail to mention why other well-known methods of implementation of a unique identifier, such as bar codes, alphabetical codes, numerical codes, alpha-numeric codes, watermarks, color coding, specialized paper, and specialized ink are not economic substitutes or are otherwise economically distinct.[4] Without plain allegations that Defendants' alleged submarkets are economically distinct from the greater ticket validation solution market, Defendants' market definitions are implausible and fail on their face. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (holding that a market definition was implausible because it "omit[ted] many economic substitutes"); *Gamboa*, 808 F. Supp. 3d at 966 (finding the market definition implausible as it failed to include all economic substitutes); *POURfect Prods. v. KitchenAid*, No. CV-2009-02660-PHX, 2010 WL 3488269, at *4 (D. Ariz. Aug. 31, 2010) (failing to allege a submarket as a separate economic entity).

---

[4] *See* Dkt. 39, Ex. 1. Defendants argue that this Court should not consider Exhibit 1 to Pyramid's Motion claiming it creates a fact issue. Plainly, the Court can take judicial notice of facts that are not subject to reasonable dispute and apply common sense. *See* Dkt. 39 at 15 n.8. Even if not, however, the point is that Defendants are necessarily aware of other solutions in the market, as a market participant, and deceivingly fail to acknowledge other competition in their Amended Counterclaims. *See Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001) (market definition was contradicted by plaintiff's own experience).

In fact, Defendants' reliance on *SolarCity* and *Origami Owl* misses the mark. While *SolarCity*'s product market is limited to two electricity options, solar power or electricity from the District, the geographic market is significantly smaller than the entirety of the United States as pled by Defendants. No. CV-15-00374-PHX-DLR, 2015 WL 6503439, at *7 (D. Ariz. Oct. 27, 2015). *SolarCity's* geographic market was limited to the defendant's service area thus making it plausible that within this limited service area, customers only have two electricity options. *Id.* As explained below, within the entirety of the United States, it is entirely implausible that customers would only have two ticket validation solutions available to them, Pyramid's and Defendants', as pled by Defendants. *See* Dkt. 39 at 17 n. 10; Dkt. 41 at 16. Likewise, the narrow product market in *Origami Owl* is not analogous to the artificial limitations Defendants applied to their product markets. *Origami Owl* limited its market to online sales of jewelry, excluding brick and mortar stores from its definition. No. CV-15-00110-PHX-DGC, 2015 WL 4747101, at *3 (D. Ariz. Aug. 7, 2015). Pertinently, *Origami Owl* explained this limitation because customers could not acquire its "specially-designed custom" jewelry in stores and stores did not have the same electronic ordering capacity as customers experienced online. *Id.* Distinctly, here, Defendants are not pleading the relevant markets have online versus in-person ordering capacity or restraints. Instead, Defendants want this Court to believe that the use of QR-codes makes the functionality of the parties' ticket validation solutions so distinct that no other ticket validation solutions could possibly be contemplated as substitutes. This is implausible.

Similarly problematic for Defendants is the geographical scope of the alleged markets. Despite asserting international scope of competition in their counterclaims, Defendants now backtrack limiting the scope to the United States. Dkt. 41 at 16. This scope is nowhere to be found in the Amended Counterclaims and is belied by Defendants' own allegations and experience. Dkt. 29 ¶ 127; *Tanaka*, 252 F.3d at 1063 (geographic market was not appropriately defined as contradicted by the plaintiff's own allegations

and experience). But even if the Court accepts Defendants' new reduced geographic scope, Defendants' claims still should be dismissed. Skills gaming are regulated on a state-by-state basis and Pyramid is not in every state. *See* Dkt. 39 at 17 n.10. Setting aside Defendants' own claims of fear of Chinese competition, any claim that Pyramid maintains a monopoly in the United States necessarily rings hollow. *POURfect Prods. v. KitchenAid*, No. CV-09-2660-PHX-GMS, 2010 WL 1769413, at *3 (D. Ariz. May 3, 2010) (dismissing monopolization claim for failure to adequately define geographic market).

### V. Counterclaims I and II Should Be Dismissed With Prejudice

Defendants' Amended Counterclaims and their Opposition make clear that their monopoly claims are part of their quest for vengeance after Pyramid refused to sit by idly while Defendants breached their contractual obligations and misappropriated trade secrets. In truth, Pyramid and Defendants are small players in a much larger market. Defendants' request to amend yet again should be denied. Defendants were provided with notice, a detailed deficiency letter, a meet and confer, the opportunity to amend, another deficiency letter, opportunity to meet and confer and yet another opportunity to amend. Defendants clearly cannot state an antitrust claim, and this part of the case should be closed. *Dakota Territory Tours ACC v. Sedona-Oak Creek Airport Auth. Inc.*, 383 F. Supp. 3d 885, 900 (D. Ariz. 2019) (denying leave to amend antitrust claims where plaintiff had already amended its claims once).

## <u>CONCLUSION</u>

For the foregoing reasons, Pyramid respectfully requests that the Court dismiss Counts I and II of Defendants' First Amended Counterclaims in their entirety, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

Dated: September 10, 2026

Respectfully submitted,

*/s/ Patricia V. Waterkotte*
Patricia V. Waterkotte
Zoey Kotzambasis
**RUSING LOPEZ LIZARDI & SAFFER, PLLC**

-and-

Kal K. Shah
Emily Wilbur
Samantha L. Marchand
**BENESCH FRIEDLANDER COPLAN & ARONOFF LLP**

*Attorneys for Plaintiff Pyramid Technologies, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served this September 10, 2026 via Notice of Electronic Filing, generated and transmitted by the ECF system of the District of Arizona, to all CM/ECF registrants.

By: */s/ J. Harris*